Warrensville Heights (Village), Plaintiff, *v.* Bowers, Tax Commr. et, Defendants. (Two cases.)

Common Pleas Court, Franklin County.

Nos. 208540, 209502.   Decided March 3, 1961.

*Mr. Thomas O. Matia*, for plaintiff.

*Mr. Mark McElroy*, attorney general, and *Mr. Robert J. Kosydar*, assistant attorney general, for defendant, Stanley J. Bowers, Tax Commissioner.

*Mr. Joseph A. Zingales*, for defendant, Village of North Randall.

SATER, J. These two cases seeking declaratory judgment and other allied relief were consolidated for trial because all three causes of action contained in them turn on the wording and interpretation of a portion of the same statute, Section 3769.081, Revised Code, effective August 1, 1959. That statute reads as follows:

"The tax commissioner shall collect from each permit holder who conducts a pari-mutuel or certificate system of wagering where the wagering is less than five million dollars a sum of money equal to one tenth of one per cent of the total amount wagered and where the wagering is five million dollars or more a sum of money equal to fifteen hundredths of one per cent. of the total amount wagered during any horse-racing meeting for the purpose of providing operating revenue for the political subdivisions wherein such meetings are held. Such moneys shall be collected by the commissioner within ten days after the close of such meeting and shall be forwarded immediately to the chief fiscal officers of the municipal corporations or townships in which such horse-racing meeting took place and in which any such facilities or accessory uses therefor were located. Such moneys shall be divided equally between the municipal corporations or townships in which such horse-racing meeting took place and in which any facilities or accessory uses therefor were located. Such municipal corporations or townships may distribute a portion of the moneys so received to any adjoining political subdivision which incurs increased expenses because of such horse-racing meeting.

"This section shall not apply to any agricultural society which holds a horse-racing permit.

"The amount collected under this section from any one permit holder shall not exceed fifteen thousand dollars from any one horse-racing meeting in any calendar year."

For the purposes of these cases the Village of North Randall is contiguous to and bounded on the west, north and east by the Village of Warrensville Heights (for the sake of brevity these two names will be referred to herein as North Randall and Warrensville). The boundary on the west is Warrensville Road, on the east it is Northfield Road; and on the north it is an east-west line about 557 feet south of Ellacott Parkway which is in Warrensville. Along this line between these two roads is a high heavy wire, Cyclone-type fence surmounted by strands of barbed wire.

Raceway Properties, Inc., formerly, and Cleveland Raceways, Inc., now owns a tract of land of about 122 acres between these two roads and lying mainly in North Randall but extending in its northwesterly portion up to Ellacott Parkway in Warrensville; it is across this tract that the boundary fence referred to above extends, and so far as the record shows, the fence has been maintained, if not also actually created, by these successive property owners. At least two-thirds to three-quarters of this tract lie south of the fence and in North Randall. In this fence near its western end on Warrensville Road is a gate.

On the North Randall portion of this entire tract is located what is familiarly known as The Thistledown Race Track used for horse racing. There we find, as was conceded by Mayor Recak of Warrensville, the entire track itself, the grandstand for spectators, the horse barns, the paddock for horses ready for or leaving the track, all of the equipment and public totalizer board used in pari-mutuel betting, and sizable parking areas behind (south of) the grandstand for the benefit of officials, horse owners, employees of all sorts, and patrons of the track. The property owners also have a mutual arrangement with the owners of the North Randall Track immediately across Warrensville Road to the west to utilize each other's public parking area whenever there is an overflow of patrons' cars in the course of a racing meet at the other track; Thistledown owners have contracted out the public parking concession at their track, and they pay rent to the North Randall Track owners whenever

Thistledown uses their parking space. A parking fee is charged for patron use of each of these spaces. But strangely for a track concerned only with making money, this concession does not include the parking lot described immediately hereafter (Guren, page 25).

North of the North Randall-Warrensville boundary line with its heavy wire fence, the owners of Thistledown have leased out (see Exhibits 2 and 3), to Musicarnival, Inc., all of the northwest corner of its property bounded on the west by Warrensville Road, except for a filling station on the immediate corner, on the east by Northfield Road, and Ellacott Parkway on the south. This leased-out area contains something less than twelve acres. To the east of it, clear to Northfield Road, there is unimproved grassland that Thistledown owners keep mown for hay and whereon race horses may once in a while be exercised; but with this land and its use we are by the pleadings and evidence, not here concerned. The western part of this leased-out acreage (see Exhibits 1, 6, B and N) abutting on Warrensville Road and constituting about forty percent thereof is used by Musicarnival, Inc., for its officers and its recreational and amusement equipment and devices. The remainder is a parking lot, the hard surface improvement and maintenance of which was divided roughly equally between Musicarnical, Inc., and the owners of Thistledown.

This lot is used by Musicarnival, Inc. every night of the year that operation is open. On the afternoon of race meets, it is used for over-flow parking by Thistledown and its permittees. The lot is also made available all year long to the Municipal officials and board of education of Warrensville, whose city hall is directly across Ellacott Parkway from the lot. It is not unlikely that utter strangers to the above-named parties also park there at times. There is little question that Thistledown patrons do use this parking lot but there was serious conflict in the evidence whether they paid to park there, whom they paid, and how much; there is also serious conflict whether "free-parking" signs designed for the benefit of Thistledown patrons were erected close to the lot during race meets, who put them up, and how long they remained in place. The foot gate in the heavy wire boundary fence that formed the southern margin of the lot was near the southeast corner of the lot. Some evi-

dence indicated that this gate was always locked except when its lock was unlawfully broken, other evidence indicated that it was rarely locked, and still other evidence indicated that it was locked only part of the time—all during race meets. Suffice it to say that two facts and one conclusion arise from Thistledown patrons' use of the lot. (1) Patrons who parked there showed a marked disdain for use of the gate; their marked preference was for crawling through a hole or holes in the fence (which holes Thistledown periodically and futility repaired), going under or through hinged parts of the track rail, crossing the track's infield, and again crossing the track to get close enough to pay admission to the grandstand. (2) There was no evidence that any Thistledown patrons, after parking on the lot, ever walked westerly on the lot to the walkway on the east side of Warrensville Road, and thence to the area of the grandstand. (3) If Thistledown or its permittee tenants ever had or claimed the right, absolute or optional, to use that lot for overflow parking for their patrons, it is amazing that they should make use thereof so difficult that its use entailed damage to property far more often than it did not; it is almost as though they preferred patrons' cars to be parked elsewhere. Why reserve use of a parking lot and then fence it off so completely that trespass is the rule? We hazard the guess that that did not occur in connection with the closer parking lots at the North Randall Track.

(It might enlighten the reader to note that the owner of a horse race track in this State need not be the one which conducts the race meets. It may be a tenant or occupant pro tem of the owner's property. But in either event, whichever conducts the meet must first secure a permit from the Ohio State Racing Commission. That is why we find in the record here such a variety of names as Cranwood, Thistledown, Jockey Club, etc., covering the three meets in question, one in September-October, 1959, one in June-July, 1960, and one in September-October, 1960, all at the Thistledown Track.)

Thistledown's old lease with Musicarnival, Inc., was dated April 1, 1956, and was to run for about five years; its section 12 covered Thistledown's right to use the parking lot on the Musicarnival premises. But one year later, April 1, 1957, this lease was modified in writing, the old section 12 was deleted and

a new section 12 set in its place. See Exhibits 2 and 3. The pertinent portions of the new section 12 are sub-paragraphs d, e and f; they read as follows:

"(d) Lessor and/or Thistledown Jockey Club, Inc. shall have the right, in connection with the operation of the Thistledown rack track, to use not only the portion of the said parking area as established on Lessor's additional premises to the east of the leased premises but also the portion so established on the leased premises. Such use shall be without charge by Lessee and without reduction in the rent agreed to be paid by Lessee for the leased premises.

"(e) Lessee shall have the right, in connection with the uses permitted it under this Lease, to use not only the portion of the said parking area so established on the leased premises but also the portion so established on the Lessor's additional premises to the east of the leased premises. Such use shall be without charge by Lessor and without increase in the rent agreed to be paid by Lessee for the leased premises.

"(f) The parking area shall be used, as between the parties, in a reasonable manner and each shall co-operate fully with the other so as to avoid interfering unreasonably with the other's use of the parking area, with the Lessee's use of the remaining portion of the leased premises or with the Lessor's use of the remaining portion of the retained premises. The parties shall permit the Village of Warrensville Heights and the Warrensville Heights Board of Education to use the parkink area free of charge at such time and on such occasions as not to conflict with use of the same by the parties themselves; provided, however, that the parties, or either of them, may require proper and adequate indemnification through insurance coverage or otherwise against liability by virtue of any such municipal use."

Aside from a prospective larger mutually available parking lot, few signs of which have yet appeared, these provisions add little, if anything, to the former section 12. The record here is far more complete than that which the Attorney General had before him almost exactly a year ago when he delivered to defendant Bowers his Informal Opinion No. 137. See Exhibit P. But the question still remains: Is this parking lot in Warrens-

ville a facility or accessory use to the running of racing meets across the fence at Thistledown in North Randall? For reasons stated in his Opinion, the Attorney General held that it was not. For complementary reasons, we reach the same conclusion.

Many sections of the old lease were not modified at all, are still binding on the signatories and their successors, and must be considered in pari materia with the new modified provisions. Musicarnival still has the right to improve its leasehold included parking areas. Sec. 4. It is responsible for all taxes and assessments. Sec. 5. It must carry stated amounts of insurance and pay all utility bills. Secs. 7 and 9. It must maintain the premises. Sec. 10. Thistledown may withdraw from the lot on the leased premises the land fronting on Ellacott Parkway (sec. 21), but if it does so, it must provide Musicarnival with other equal land contiguous to that covered by the lease. Its land is separated from Thistledown by the high fence; it had its own parking lot permit; and has hired its own parking attendants, Murphy Parking Company. Mr. Bishop, president of Musicarnival, stated in his deposition, ''That fence is along the boundary between Warrensville Heights and North Randall. It also marks the boundary between what you might call the operative part of the track and the area owned by the track, or leased to us, which is outside.'' In short, Musicarnival, Inc. was and still is the dominant party and Thistledown the servient in the land covered by the lease and by the modification thereof. It is not logical to assume that Thistledown will withdraw land for housing purposes on Ellacott Parkway in such a respectable community as Warrensville, and then create a race track parking space immediately behind it even if the Warrensville housing and zoning authority would countenance such a combination of uses. Furthermore, Thistledown pushed itself even farther into the background by throwing open, in the lease modification, the use of the parking lot as it now is or will hereafter be to the Warrensville public officials. Nor may Thistledown, on the penalty of refusing admittance, command where its patrons must park.

Said Thistledown's general manager on deposition, and commenting on the parking lot in question, ''This property

here isn't even in our particular properties as far as operations (indicating).'' This candid statement is amply borne out by his earlier testimony that for a grandstand seating capacity of 6,500, Thistledown's own immediately adjacent parking lots around the grandstand will hold more than 3,700 automobiles; that these lots were filled to capacity only once or twice in 1960; and the overflow went to the North Randall Track lots or wherever they could park. This testimony is buttressed by that of Richard Sullivan, president of Musicarnival's lot attendant Murphy Parking Company; he said that Thistledown patrons also parked on the ''Little League'' baseball lot on the Cranwood race track in Warrensville, in the open field east of the Musicarnival lot, and even on Ellacott Parkway itself. Nor does the record indicate that the Musicarnival parking lot attendants were Thistledown employees; they couldn't be.

This disassociation between Thistledown and the parking lot in Warrensville, despite the lease and its modification, is carried further by two other able witnesses. Mr. Kull of the Ohio Racing Commission stated that all of the land taken for the race meet must be set out in the application for a racing meet permit; but the description of the land does not mean that the permittee will use all of that land to conduct the meet. Thus on a part of that land there could be a miniature golf course, a garden of rare roses, or a drygoods store. Is every place that a patron parks his car a facility or an accessory use to a race track? Impossible.

Finally, Mr. Guren, president of Cleveland Raceways, Inc., which owns Thistledown, in a burst of candor stated in his deposition that ''actually all you need for a race meeting are people to bet on the track and horses.'' Then in an even greater burst of candor, he really let the cat out of the bag. He said:

''In 1956 the then Village of Warrensville Heights required additional land for Village purposes and was considering condemning by way of eminent domain all of the land of Cleveland Raceways, Inc., situated in the Village of Warrensville Heights to the north of this boundary line. As part of the general framework of working out a solution with the Village of Warrensville Heights, we and Musicarnival agreed that we would put in this parking lot, and that we, the two of us, would share

the maintenance, because it would serve our common purpose. One, it would provide for the patrons of Musicarnival to have a hard-surfaced area. Two, it would serve the patrons of the race track for overflow parking. And three, it would be available to Warrensville Heights to help them solve a problem and to keep them from considering too seriously the condemnation of the land.''

There it is in a nutshell. Thistledown's great interest in this lot was not a concern for its race meeting patrons; it was primarily an effort to stave off an appropriation proceeding of desirable acreage by Warrensville.

The statute quoted above uses the expression ''any facilities or accessory uses therefor'' (horse-racing meeting). ''Facilities'' and ''accessory uses'' are not words of art. They are words to be used in their common everyday meaning as found in any standard or legal dictionary. Each and both of them apply here to the land or place where the thing is located and is automatically and primarily incident to the main use of the remaining land; but here the main use is a musicarnival area, not a race track or gesture to public officials, nor an effort to avoid appropriation. For like reasons this lot is not primarily adapted for the use of race meetings; it can be and is with equal ease put to a variety of other uses. A ''facility'' or ''accessory use,'' if those words mean anything at all in the light of the facts of these cases, must allude to the primary use of the land on which the lot is located and not to a business that happens to be conducted next door to it. The words ''facilities'' and ''accessory uses'' as employed in the statute and in reference to this lot clearly refer to some personal accommodations furnished for the comfort of the patron to enable him to obtain a better view of what he came to see when he entered the race track grounds. Free parking some distance away is not demandable by the patron as a part of the privilege he obtained by paying the entrance fee into Thistledown's grounds; he is at full liberty to arrive and depart, to park or not to park whenever and wherever he may see fit. As to free or non-free parking lots, he can ''take them or let them alone'' according to his own volition. They are not facilities or accessories that are arranged for or which are necessary for his comfort, such

as appropriately arranged seats, or to furnish him a more advantageous view for his internal survey of what the Thistledown grounds contain.

In view of the facts in these cases and in light of the principles of law and semantics applicable thereto, plaintiff's prayer in each petition is denied. The foregoing discussion disposes of the need for ruling on defendants' various motions made at the end of plaintiff's presentation and renewed at the end of the trial.

Since there are here two cases consolidated for trial, the original of this decision will be filed in Case No. 209,502 and a copy in case No. 208,540.